I have five cases on our panel this morning, one from a district court, one from ETAP, two from the Yard Systems Protection Board that have been submitted on the briefs from Norwich Pharmaceuticals and Bosch Health v. Norwich Pharmaceuticals, 2026, 2153, and 1952. May it please the Court, although I'll be pleased to answer questions regarding the expired later this year. The IBSD patents expire in 2029, so I'd like to focus my opening argument on the district court's two errors regarding the IBSD patents. First, misallocating the burden of two regarding the press release, and second, misapplying the court's prior art range cases and holding the claims invalid as obvious. The error with respect to the convincing evidence on all issues related to the status of the press release as prior art. This includes whether the press release was by others for purposes of pre-AIA Section 102A. Norwich failed to carry that burden. It does not argue to this Court that it did carry that burden. For these two IBS patents, the listed co-inventors for each one is a different overall entity. One is Forbes and Forte, and the other one is Forbes and Johnson. I don't think Forte or Johnson are identified anywhere in the press release. Is that right? That's correct, Your Honor. So just on the face of the press release, what is wrong with concluding that there's no indication that the actual co-inventors were the ones that matters so much? There's nothing inconsistent with the face of the press release to conclude that the co-inventors were involved either. That's why this issue ultimately comes down to a question of burden. I'm not arguing that Salix carried or bore a burden to show that the press release was reporting the work of the inventors. My argument is that Norwich bore the burden to prove, by fair and convincing evidence, that the press release was not reporting the work of the inventors. Was there any possible sort of shifting of the burden to Salix once Norwich's data case were published? There might have been had Norwich made out a prima facie case that the press release was reporting the work of individuals other than the inventors. So the burden of the press release is never quoted for us. So it was just a bland press release saying we have some exciting results we wanted to report. Here are our results from this clinical trial, period. Would that have been enough to say, look, there's no indication of who in this very large company actually produced the content of this press release or was responsible for it? So we can at least initially conclude that it's not I think it's the burden of the challenger, as this Court has said, to prove all of the facts related to the status of a reference as prior art. The challenger would need to come in and provide enough evidence. Usually this is accomplished on the basis of the reference that the press release was by the company where the inventors worked. I certainly don't think it's enough just to point to it and say, well, it doesn't tell us whose work was being reported on. Therefore, you can find it was not the inventors. The best prior art against you would be Parmentel. Parmentel discloses this material and this treatment, and it also says it was a higher dose. Yes, Your Honor. But as you see from the District Court's analysis, the District Court placed heavy reliance throughout on the RFID-2001 press release, particularly in overcoming Salix's evidence of skepticism. Pimentel was, in his own words, a lone voice in the wilderness. Pimentel 2006 was a deeply flawed reference. It was published accompanying the Drossman editorial, noting methodological issues with it. The question here is not whether the District Court could have reached the same result, not relying on Drossman. Do you agree that there was other evidence before the District Court, such as Viscomi 2005, that could have allowed the District Court to reach the conclusion regarding the claimed range? Well, potentially, but there's a key fact finding that the District Court didn't make that it would have needed to rely on some of the other evidence, such as Viscomi 2005. There was this hotly disputed issue between the parties about the relationship between SIBO, that's small intestinal bacterial overgrowth, and IBSD. My friend's arguments primarily said, well, we can treat SIBO using certain dosages, and SIBO is a symptom of IBSD. Our expert testified precisely to the contrary. I'd point you to appendix page, essentially 3260 to 3262. He said, no, SIBO is a different disease than IBSD. A diagnosis of SIBO is inconsistent with a diagnosis of IBSD. So it's critical to us that when you look at what the District Court actually relied on in finding an expectation of success, that's appendix pages 34 and again appendix pages 39, the only prior art references that you look to were those prior art references that actually reported success in treating IBSD. He did not rely on any of my friend's references. Your Honor, with the protocol, the protocol was simply a test plan, and that's my second issue, with respect to particular claimed dosages. Well, the protocol suggests that the range between 1,100 and 2,200 milligrams per day might be tested. In fact, it went even lower, 550 to 2,200 milligrams. But the protocol alone didn't give an expectation of success across that entire range. And in fact, even looking at the press release, it doesn't justify a finding of expectation of success. We argued to the District Court. You mean you put this compound in human beings without expecting them to do something useful? The testimony in this record, appendix page 3313 to 3314, is that the treatment literature is rife with examples of drugs that might look good in a case study and then be unsuccessful in phase two. We certainly hoped it would be successful, but we did not have an expectation of success across the entire dosage range. Do you have some kind of, I don't know, hope that's expected to be met before you start engaging in phase two trials with humans and drugs? There's no indication of that in the record, Your Honor. Certainly nothing here. I think it probably depends on, I guess, first, are there alternative treatments available? Are you potentially depriving patients of known successful treatments? As we pointed out in our statement of facts here, this was an area in which there were no known good treatments for IBSD. The second question might well be, how harmful is it likely to be to the patients? Are we giving them something like chemotherapy? There's no evidence here that this was a particularly harmful or risky treatment for the patients involved in the study. Our expert testified he had used it with some patients, but did so as an experiment without an expectation of success. Well, there was widespread use by gastroenterologists using this particular drug for IBS. Something like 74% of all gastroenterologists interviewed said they prescribed amoxifen for IBS. Many of them have, but again, I'll point you to our expert's testimony. As he said, appendix page 3319, he was trying it as an experiment out of hope and desperation, just because there were no other options available. And remember, this is a drug. I'm sorry, Your Honor. I was going to say, do you believe that we have to reach the issue of whether or not the press release is prior art in order to resolve the issues relating to the IBSD patent? Well, if you agree with us on my second issue, which is that Norwich failed to show a reasonable expectation of success in the claim dosage, I don't believe you need to reach the issue of the press release as prior art. And the point there is that when you look on appendix page 39, this is the evidence credited by the district court of prior art reporting successful results for the treatment of IBSD. He's crediting references that teach the use between 1,100 and 1,200 milligrams a day. This claim dosage is nearly 40% higher. The only dosage he cites that is greater than 1,200 milligrams a day is the 2,200 milligrams a day mentioned in the protocol. We argued on appendix page 40 to the district court that protocol is just protocol. It doesn't carry with it an expectation of success. The district court did not make a finding that says, I find that merely because something is tested, there would be an expectation of success. In response to that, this is appendix pages 41 to 42, the district court said, well, it doesn't matter that the protocol doesn't include results because skilled artisans would have known press release. But critically, when you look at the press release, the press release does not say everything we tested worked. The press release says we succeeded at 1,100 milligrams a day. Not only is that silent as to the success of 2,200 milligrams a day, but the uncontroverted evidence is that skilled artisans would have understood that meant 2,200 milligrams per day didn't work. In fact, that's the truth. 2,200 milligrams a day did not do any better than placebo in the RFIB-2001 study. You'll see that at appendix page 30-42. The testimony that skilled artisans would have understood it didn't work was appendix page 33-14. When you look at what the district court credited here, the district court said positive results for a range of dosages, but the only positive results to keep credits on appendix page 39. I assume 1650 did better than 1,100 milligrams? That was not tested as part of the RFIB-2001 protocol. That was tested in our phase three clinical trial when we eventually adopted that. But I'll point out what the FDA was saying about that. In 2011, this is about two and a half years after the critical date, after our first phase three trial, the FDA is still looking at that saying, I'm concerned about how we figured out this almost magical 553 times a day dose. We still don't know much about IBS. We're treating a disease, which we know nothing or very little about, with a drug we know little or nothing about. We went through tremendous work to demonstrate to the FDA that this was the right dosage. This was actually successful. What page were you just reading from? You'll see that appendix page 52-45. It's an FDA committee that was Dr. Pizrice discussing at that committee there. But the key for us is, it's not enough simply to say there was some expectation of success in using refractment to treat IBS. We have to find a reasonable expectation of success in the claimed dosage. And on that issue, the press release not only doesn't hurt us, but the press release helps us. Because the press release tells skilled artisans that 1,100 milligrams per day worked in the RFIB-2001 study, but that 2,200 milligrams per day was unsuccessful. And nothing in the district court's opinion supports the finding that 1,650 milligrams per day is within the known range. Do you want me to save considerable time? I'm going to save it. I'll continue. No, Your Honor. I had hoped to save time for rebuttal. I've got some. Mr. Landmark. Thank you, Your Honor. May it please the Court, I'd like to spend a few minutes on Salix's appeal and then spend the remainder of my time on our cross-appeal. Starting with the IBSD patent, even if Salix could have shown that there was some error in the district court's finding that the press release was prior art, the district court did not only rely on that single document in finding reasonable expectation of success. In fact, the district court found that I quote, widespread off-label use in the prior art. I can't think of more compelling evidence of reasonable expectation of success than actual poses at the time administering the drug for the claimed purpose. But it was also supported by other pieces of prior art, including Pimentel 2006, Cuoco, Yang, and Barrett. But the district court didn't err with respect to its finding on finding the press release as prior art. In fact, it was issued by Salix, not a named inventor. It's undisputed it was publicly accessible. And it credits the protocol not to an inventor, but to Salix in consultation with FDA. And there's nothing on the face that credits the inventor with anything inventive. And in fact... What is your response to the press release referencing Forbes? So obviously, Forbes is mentioned or quoted as an officer of the company. Notably, as was already noted by the panel, the patents mentioned two different groups of inventors, not just Forbes. It doesn't say that Forbes actually came up with anything. And in fact, most of the information on the press release was already publicly disclosed in the RFID 2001 protocol. So, you know, in addition to the method steps were there, the efficacy endpoints were there, the dosage was there. And you can't simply repeat prior art in something and then try and keep that to... Right. It's really just a results question. About 1100 milligrams and how well it's there. Correct. The disclosure of the inherent results. What is your response to your opposing counsel's pointing us to appendix page 5245 in terms of the statements made there about the dosages? Was that the FDA statement, Your Honor? Yes. It's appendix page 5245. He was just discussing it towards the end of his argument. Sure. Thank you, Your Honor. A few things on that. There's no evidence that anyone who made that statement at FDA is an actual POSA. That was not put before the court. But in addition, there was plenty of evidence that of the dosing range in the yard. First, Pimentel 2006 had 1200 milligrams per day, as was mentioned. The RFID 2001 protocol itself discloses up to 2200 milligrams per day. But there were other prior art references as well. There's still only 2000... I thought that we were just talking about that the 2200 might not work any better than placebo. Is that... So the evidence doesn't... The press release doesn't mention the results of the 2200 milligrams in the press release. But there was other prior art evidence as well. For example, this filming 2005... Can you respond to my specific question? I thought that I heard opposing counsel point us to something that said 2200 didn't work better than placebo. I'm sorry, Your Honor. Sometimes greater than 1100 doesn't work. I'm just trying to get your response on that aspect. Yeah, I'm sorry, Your Honor. There was expert testimony from their expert. That expert testimony was pure edtdicts. There was nothing more behind that except the expert's statement. There was nothing at the time of the invention where it was disclosed that 2200 milligrams was not working. Was not working? Was not working, yeah. Correct, Your Honor. In fact, other prior art, the Viscomi 2005 disclosed 1800 milligrams a day working. Scarbellini disclosed up to 1600 milligrams per day. And the court found widespread off-label use. And I'd like to mention one of those uses was a use by a Dr. Weinstock. He actually communicated to one of the named inventors two years before the filing date that he was successfully using 1800 milligrams per day. He later published a retrospective study showing that use. So the Weinstock and Javy reports were post-priority dates. So those reports don't count as prior arts, no? Well, so they are post-priority dates, but they're reporting activities that happened pre-priority dates. So there were actual uses that they were doing as prescribers pre-priority dates is what the admin showed. Well, how do we consider that? The reference is still not prior art. So this court's allowed to look at post-priority documents that show uses or activity that was happening in the pre-priority time frame. So what kind of prior art is that? Is that 102A or 102B art? What do you designate that? It's a public use. It's a use by others. Right, but Judge Andrews didn't make a ruling that Javy or Weinstock did prior public uses. He made a ruling that there was widespread off-label use. And this was prior art that was before him in the record. So this prior art evidence is the widespread off-label use. Even if he didn't go through and catalog all that use, it is still evidence that was before him that showed that widespread off-label use. And the widespread off-label use was the foundation of his determination on reasonable expectation of success. Your opposing counsel said something about how some of these other references, I don't know, Piscoli or others, maybe, aren't really useful and reliable for you because there were big arguments at the time as to whether bacteria overgrowth was in any way related to IBS. Can you comment on that? Yeah. The district court weighed all that evidence. The district court considered all that evidence. And the district court still said that Opoza would have still had a reasonable expectation of success administering Rifaximin. And the widespread off-label use is probably the best evidence of that. And the district court weighed that and came to that conclusion after weighing the evidence. And I don't think anything Salis has pointed to on appeal has demonstrated that that is clearly erroneous. So, Your Honors, if I may turn to our cross appeal. The district court's 271E order should be vacated as improper because it blocked FDA from approving Norwich's amended ANDA, despite the fact that that amended ANDA does not contain the infringing agency indication. In fact, FDA's regulations specifically permit Norwich's amended ANDA to have only Section 8 statements to the H.E. patents, which cannot be the basis for infringement under H.E. Just so I understand, Your Honor, your argument right now is about how your 60B motion was not granted? Is that the argument you're making? There are two components to that. Because you didn't have the amended ANDA until after final judgment. Correct. But the scope of the original ANDA, expanding out beyond the H.E. indication, was improper itself under the statute under 271E4. So we are challenging both the scope of the original ANDA and challenging the court's denial of our Rule 60B motion. Okay. So which one are you focusing on right now? You can just focus on one, and then the second one later. Thank you, Your Honor. Yes, I can focus on the first one, which is the original scope of the court's order is improper. It's absurd for Norwich's ANDA to be blocked by a 271E order that stems from infringement of a patent that Norwich only has a Section 8 statement to and is not seeking approval for. Norwich is in this unfair position because the court simply used the ANDA number in its 271E order and gave it a much broader scope than its limited infringement finding, which was focused on the H.E. patents. That's contrary to patent law principles, which state that the scope of injunction should not exceed the scope of an infringement finding. Clearly, Your Honor, if a court This is an abuse of discretion issue, right? No, Your Honor. I don't think the court, it's not a discretion issue because of what the statute says and what 271E4 says in this court's determination of the scope of injunctions. The Rule 60 issue wasn't discretion? No, well, the Rule 60 issue, it separates you as addressing the first issue, but no, the Rule 60 issue also wasn't within the court's discretion, again, kind of given the scope of the statute. I guess, as I understand, the district court said he was, at the time of final judgment, stuck with the form of the ANDA that you had submitted, and at that time it did include the H.E. indication, and so that application had to be blocked. I'm not along with that line of thinking. Sure. A few different things, Your Honor. First, under the plain language of the statute, the statute says under 271E4A that the order should be directed to the drug involved in the infringement. And here, Norwich's drug, rifaximin, is only involved in the infringement when it's used to treat H.E., and that was the limited scope of the court's infringement finding. Under the construction applied by the court and by Salix, the words involved in the infringement would be deemed superfluous, and that's improper under the Supreme Court's canon of construction that every word of the statute should be given meaning. But also, statutes need to be construed to fulfill their congressional purpose. And here we know that Hatch-Waxman was enacted, and this court has recognized it. Hatch-Waxman was enacted with the goal of bringing generic drugs to market as quickly as possible. And both this court and the Supreme Court have recognized that the Section 8 mechanism fulfills this purpose to enable generic companies to get approval for products that are only directed to methods that are not covered by a valid patent. It's important here, too, that Congress didn't put a temporal... ...approval of the drug... So it then says, it goes on to say, Your Honor, it starts with the effective date of, or the effective date of any approval of the drug, but then goes on to say involved in the infringement. And our position here is the district court didn't give any value to the involved in the infringement and essentially rendered that part of the statute meaningless. So it's important Congress didn't put a temporal limitation on Section 8 statements. In fact, FDA has a regulation that says you can submit a Section 8 statement after a finding of infringement. But the district court's order in Salix's construction of the statute basically eviscerates the statute and FDA's regulation. But it also conflicts with basic patent law. As this court knows, injunctions are supposed to be tailored to the act of infringement. And just imagine a situation where a Ford F-150 is found to infringe a patent directed to intermittent windshield wipers and a court issues an injunction that says Ford can't sell any Ford F-150 models regardless of whether they have the infringing wipers. We have the intermittent windshield wiper case. This is a drug case. Well, it's a drug case, but the same principles of patent law apply. In fact, when Congress adopted 271E4A, Congress knew what those principles were, and Congress intended for this court and for courts generally to apply those principles in 271E4A orders. I guess in your Ford F-150 hypothetical, Ford could just remove the intermittent windshield wipers, and then that would, you know, cause the plaintiff to then seek a contempt for seeking, right? Well, if that's what would happen. If the district court issued an order as broad as saying Ford can't market an F-150, that's what would happen. And here, hatchbacks can't make users sell the infringing product. Well, so that's the problem. The district court should have said Norwich can't make users sell the infringing product for AG, because that would have been tailored to the finding of infringement. Instead, the court just said Norwich can't, and it's not make users sell in this context. It's get FDA approval, but Norwich can't get FDA approval for the ANDA number full stop without addressing the scope of infringement, and the scope of infringement was limited to one. So it says you can just find a new ANDA without the AG inclusion. So a couple things about that. I'm not sure exactly how FDA would handle that, but maybe more importantly, that's not required under the statute. The statute required the district court to tailor its 271E4A decision or order to the scope of infringement, and that's why the statute refers to the drug involved in the infringement. Isn't there some likelihood the FDA would fast-track a new ANDA that did not have each indication? I don't know that that's the case, Your Honor, but I guess more importantly is the district court was required to follow the statute and follow the law on tailoring its finding, tailoring its 271E order to the drug involved in the infringement, and the district court didn't do that. I may reserve the remainder of my time. Can I ask you one housekeeping question? So do you agree with opposing counsel that with respect to the polymorph patents, they will expire later this year? I notice we have a very limited argument on that, so I assume you're in agreement on that? Yes, Your Honor. If I could ask you a question about IBS again. Yes. The other side was making a big deal about the fact that Judge Andrews wrongfully relied on protocol, and protocol is disclosed range because there's just not correct, and the amicus briefs make this point as well, to rely on a disclosed range for a trial to be undergirded as evidence of reasonable expectation of success or a satisfying reasonable expectation of success. And I'd like to hear your thoughts about that. So I guess a couple things. Following this court's decision in cases like Galderma, I think it is proper to rely on a disclosed range. I would also point the court to all of the evidence in the record that I mentioned before about the different other disclosures. All right. We're just talking about the protocol itself, right? Yeah. So in the Galderma case, it was a very similar factual situation in that the disclosure had a broader range and it was actually demonstrated to be effective, at least for the claim used. And this court said it was a disclosure of the entire range. I'd also point this court has never required a clinical study to be performed to rely on something in the basis of prior art for reasonable expectation determination. We'll give you two minutes for a bottle of wine.  Thank you. Mr. Peterson. Thank you, Your Honor. I'll be as sufficient as I can. Judge Cunningham, with respect to the polymorph claims, we're happy to stand on the briefs for them, but please don't take that as a concession that we think the district court was correct. Turning to the RFIB, I'm sorry, 2001 protocol and the IBSD claims, there is one mention in the district court's opinion and analysis of a dosage exceeding 1,200 milligrams a day. That one mention in the district court's opinion is in the RFIB 2001 protocol. Judge Chin, you asked for evidence that 2,200 milligrams per day did not work. You have the testimony of our expert on 3314, who says skilled artisans, reading the press release, would read that and say, they're reporting only 1,100 milligrams a day. That means to skilled artisans 2,200 milligrams a day did not work. There was no contrary evidence that was introduced. So the only evidence in front of the court was that skilled artisans would understand correctly that 2,200 was unsuccessful. With respect to our expert's testimony that 2,200 milligrams a day was in fact unsuccessful, our expert, Dr. Schoenfeld, was one of the experts brought in by Salix to review the results of the RFIB 2001 study and help Salix understand what's going on here with these results, because there were strange results. We had success at 1,100 milligrams a day for 14 days. We were unsuccessful at 2,200 milligrams a day for 14 days. We were unsuccessful at 1,100 milligrams a day for 28 days. Salix said, this is weird. We're going to bring in experts to help us understand this. So there's no evidence in the record that would support a finding that skilled artisans would understand that the entire range from 1,100 to 2,200 milligrams a day tested in the protocol, tested in the RFIB 2001 study, was successful. The district court here didn't make a finding that said With respect to the other prior art, the district court found that it was prior art. You see this on appendix page 33. But in the expectation of success analysis, the district court is saying, would skilled artisans have an expectation of success in using refractment to treat IBSD generally, or more importantly, using 1,650 milligrams a day to treat IBSD? Yes, Your Honor, I'm just going to say, you don't see Viscomi 2005. You don't see Scarpolini there. Scarpolini is not about treating IBSD. It's a SIBO reference. Viscomi lists treatment for a lot of different conditions, not including IBSD, including IBS. The cross-appeal briefly. At the time of judgment, Norwich's ANDA included the portions of the label that Norwich now acknowledges induced infringement of the aging indication. In accordance with section 271E4A, the district court properly entered an order that restricted approval of the drug before which Norwich sought approval, that is, the drug involved in the infringement, and a number 214369. This is the ordinary form of section 271E4A orders. We've cited about two dozen examples for you in our brief. What about the fact that the district court didn't appear to address Norwich's argument on the 60D6 motion? So I don't think Norwich adequately pressed that argument. We certainly looked at Norwich's motion and understood Norwich not really to be pressing 60D6. In any event, the district court's discussion of the equities with respect to Rule 60D motions generally would apply equally both to 60D5 and 60D6. This certainly doesn't rise to the level of extraordinary circumstances. The review is for abuse of discretion, and the right route for Norwich here is to file under ANDA. Keep in mind the facts have changed for both sides following the entry of judgment in this case. The district court had specifically referenced the HG indication from this final judgment. Would that have been acceptable under 271? That's a difficult question, Your Honor. Potentially a district court might have discretion to do so. I think it's questionable. I think Farron v. Watson Laboratories probably tells us the route that Norwich should have followed if it wanted to do this. It should have made the amendment not post-judgment, but post-trial. It shouldn't have come in with a hypothetical we may want to amend at some point in the future. It should potentially have asked the district court to please delay entry of judgment. Here's a particular amendment that we are making to our ANDA with this particular language. And that would let the district court under the Farron framework say, would this be unfair or... Norwich also pointed out in this briefing that it would be unfair to be subjected to another ANDA litigation, although again with a new ANDA where you would get to enjoy another 30 months exclusion. Is that right? That we would get another 30 months. Keep in mind, 30 months is a maximum stay, not a minimum stay. So if there were no valid claims that could be asserted against a new ANDA, then it would certainly not be a 30-month-long stay. The reason it might be a 30-month... If they filed a new ANDA without the H.E. indication and we tried to sue them for infringement, is that being trivialized? Absolutely not, particularly in light of the fact that we've now had two additional issued patents for which Norwich has given us paragraph 4 certifications with respect to this ANDA. And now that Norwich has changed its indications of use, the stipulated judgment in the first litigation no longer applies. That was limited to the ANDA with amendments or supplements so long as they didn't change the indications of use. So Norwich has put itself in a position where we actually have good, viable, strong claims that could be asserted against a new ANDA. And that's why Norwich is working so hard to avoid following the new ANDA route and instead hoping to go directly to market without the opportunity for scrutiny of Norwich's label and ANDA pre-market, which is exactly what the Hatch-Klaxon Act gives to branded pharmaceutical companies. Thank you, Constance. Do we have any arguments? Mr. Landau, you have three minutes. Thank you, Your Honor. So I just wanted to address a few issues. First, of course, Salix wants the filing of the new ANDA because it would get a new 30-month stay. You've also heard the mention of new patents which would, again, rise to the level of a 30-month stay. Counsel also mentioned the ordinary form of 271e judgments, and I know there were a lot that were cited in the papers. The issue is that the issue in our case doesn't come up in most cases. Most cases deal with the finding of infringement of a product claim or a compound claim, and, of course, that extends to the end of that patent. Or if there are varying methods of use, the court has come to the same conclusion. We did provide this court with an order. It was a consented judgment where there were two different indications, and the court properly set two different dates for which FDA would approve the ANDA based on the two indications because, again, it doesn't make any sense under 271e4a or this court's normal patent law provisions to not allow a product to go to market when it doesn't infringe, when it won't infringe one of the patents, and that's why the court in that case, yes, it was by stipulation of the parties, came out that way. And then, lastly, in our Rule 60b, we've explained on our brief why it was an abuse of discretion the way the district court ruled first, and Salek surely hasn't tried to defend the court's incorrect application of the case law on the grounds we moved under 60b-5. It's indisputable that the district court was wrong to hold that the rule only applies to money judgments or that it only applies when a change is unforeseen or unanticipated, and the court was also clearly wrong not to address Norwich's raising of Rule 60b-6 in its brief and the brief that we pointed to in our brief show that we did with that. The court doesn't have any questions. Thank you.